# GENERAL OIL COMPANY *v.* CRAIN, INSPECTOR OF COAL OIL.

### ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 128.   Argued January 23, 1908.—Decided March 23, 1908.

Where complainant is entitled to equitable relief against the enforcement by state officers of an unconstitutional state statute, the judgment of the state court dismissing the bill for lack of jurisdiction on the ground that the suit is one against the State gives effect to the statute, denies complainant a constitutional right and is reviewable by this court under § 709, Rev. Stat.

A suit against state officers to enjoin them from enforcing a state statute which violates complainant's constitutional rights either by its terms or by

the manner of its enforcement is not a suit against the State within the meaning of the statute of 1873 of Tennessee, denying jurisdiction to the courts of the State, of suits against the State.

Provisions of the Federal Constitution and of the Fourteenth Amendment cannot be nullified by the State prohibiting suits in its own courts against state officers to prevent their enforcing unconstitutional statutes and contending that the National tribunals are also precluded from entertaining such suits under the Eleventh Amendment.

Merchandise may cease to be interstate commerce at an intermediate point between the place of shipment and ultimate destination; and if kept at such point for the use and profit of the owners and under the protection of the laws of the State it becomes subject to the taxing and police power of the State. The act of 1899 of Tennessee providing for the inspection of oil is not an unconstitutional burden on interstate commerce as applied to oil coming from other States and ultimately intended for sale and distribution in other States but meanwhile stored in Tennessee for convenience of distribution and for reshipping from tank cars and barreling.

95 S. W. Rep. 824, affirmed.

PLAINTIFF in error, which was also plaintiff in the courts below, invokes the protection of the commerce clause of the Constitution of the United States against the collection of a tax for the inspection of certain of its oils in Tennessee. The bill prayed an injunction against the defendant, based on the following facts summarized from the bill:

The plaintiff is a Tennessee corporation with its principal place of business in Memphis, Tennessee. It is engaged in the manufacture and sale of coal oil and other illuminating oils in the various States of the Union. Its wells and refining and manufacturing plants are all located in the States of Pennsylvania and Ohio, from which it ships its products to the States in which they are sold and used. On account of the tendency of the oils to leak and evaporate, and, under change of temperature, to burst the vessel in which they are contained, it is necessary to ship the oils in tank cars, and it is also necessary to have distributing points for such oils in various places in the United States at which it may receive the oils so shipped and place it in barrels or other similar vessels suitable in size for filling orders, which vary in amounts from one barrel upward. It would be impracticable to carry on business in or to have apparatus and

machinery for the reception and delivery of oil at every point at which plaintiff ships oil. For some years plaintiff has been engaged in business at Memphis, and has made that city not only a place of business at which to sell oil to the citizens and residents of Tennessee, but also has made it one of its distributing points to which its oils are shipped from Pennsylvania and Ohio in tank cars, from which cars the oils are unloaded into various tanks, barrels and other receptacles for the purpose of being forwarded to its customers in Arkansas, Louisiana and Mississippi, in which States it has many regular customers from whom it always has on hand many unfilled orders for oil to be delivered as soon as possible or convenient.

At Memphis plaintiff has numerous tanks or receptacles for oil of various kinds and sizes, among which are the following: (1) A tank or vessel in which is kept oil for which orders have been received from the States above mentioned before its shipment from the manufacturing plants and which are especially shipped to fill such orders. This oil is unloaded at Memphis only for the purpose of distribution in smaller vessels to meet the requirements of such orders, and is kept separate from oils for sale in Tennessee, in a tank plainly and conspicuously marked "Oil already sold in Arkansas, Louisiana and Mississippi," and remains in Tennessee only long enough (a few days) to be properly distributed according to the orders therefor. (2) Another tank or vessel for oil to be sold in those States, but for which no orders at the time of shipment from the manufacturing plants. This tank is marked "Oil to be sold in Arkansas, Louisiana and Mississippi," and is kept separate and apart from all other oil until required to supply orders to plaintiff's customers in those States, and is never sold except upon the receipt of such orders.

The defendant, as inspector of oils, from time to time inspects plaintiff's oils at Memphis and charges and collects for such inspection a regular fee of twenty-five cents per barrel, as provided in § 8 of the act of April 21, 1899, of the legislature of Tennessee, c. 349, pp. 811, 814, and the plaintiff has fully

paid such charges up to the present time on all of its oils shipped
into Tennessee, whether intended for sale in that State or other
States.    Until recently plaintiff has unloaded the greater por-
tion of its oil from its tank cars to its stationary tanks without
attempting to separate the oil sold or intended to be sold in the
States above mentioned from that to be sold in the State of
Tennessee, and paid the inspection charges upon all.   Plaintiff,
however, is now separating its oil in the manner above de-
scribed, because it has been advised that the oil intended to
be sold outside of Tennessee is not subject to inspection in that
State if kept separate from the oil sold or intended to be sold in
that State.

Defendant claims the right to inspect such oils, although he
knows and admits no sales thereof are made in Tennessee, and
claims that he is not only entitled but that it is his duty to
inspect the same and collect the regular fees for such inspection.

Plaintiff is advised and shows that defendant has no right
to inspect the oil or collect the fees, because the act of 1899
does not apply to them, for reasons which are elaborately set
out, but it is alleged that if the act should be construed to apply
to them the act is unconstitutional, "in so far as it provides
for or requires an inspection of any of the oil in said tanks,
because such inspection would be a regulation of and interfer-
ence with commerce between the States of Pennsylvania and
Ohio, from which said oil was shipped, and the States of Arkan-
sas, Louisiana and Mississippi, to which the same was shipped,
in violation of the Constitution and laws of the United States,
and especially of the third clause of § 8 of Article I of the Con-
stitution of the United States, which provides that Congress
shall have power 'To regulate commerce with foreign Nations,
and among the several States, and with the Indian Tribes.' "

Plaintiff alleges that the act of 1899 and the inspection there-
under is not a valid exercise of the police power of the State,
and to that extent the act is unconstitutional and void, because
(1) none of the oil is manufactured in Tennessee and the in-
spection, therefore, is not necessary for the protection either of

the residents and citizens of Tennessee or the reputation of her manufactured products.   (2) The fees are unreasonable and exorbitant for the service performed and very much greater than necessary to provide for inspection, and that after payment of the salaries and other expenses incident to inspection there is a surplus of many thousands of dollars put into the treasury annually.   (3) The act is void under the constitution of the State of Tennessee, because the inspection is not necessary or conducive to the benefit of the State of Tennessee or the citizens thereof, and the act is therefore unnecessary, unreasonable and not a valid exercise of the police power of the State, but a mere tax or charge imposed under the guise of a police regulation, and as such is in conflict with article II, § 28, of the constitution of Tennessee, which requires all property to be taxed according to its value and that taxes be equal and uniform throughout the State.

It is alleged that the act provides in § 2 a heavy penalty, consisting of a fine of from twenty to fifty dollars for each offense, against any dealer or manufacturer who shall obstruct the inspector in the discharge of his duties, or refuse to permit him upon his premises for the performance thereof; and provides in § 4 that it shall be a misdemeanor for any person to sell any oil before having it inspected as provided in the act, and on conviction shall be fined $300, and the oil, if found to be rejected, shall be forfeited and sold. · Plaintiff therefore, it is alleged, on account of the severe penalties, could not afford to take the risk of selling any oil without inspection or take the risk of refusing permission to inspect.   That it is doubtful if plaintiff, if it paid the fees under protest, could recover the same, and if they could be recovered it would be necessary for plaintiff to bring suit every thirty days for the charges paid for the preceding thirty days, so that an indefinite number of suits would be necessary.   Irreparable injury will therefore result, it is alleged, if the inspection against plaintiff's oils under the act of 1899 be not enjoined.

Defendant filed a demurrer which attacked the bill for want

of equity, and also the jurisdiction of the court to hear and determine the cause, for the reason that it was a "suit against the State, or against an officer of the State, acting by authority of the State, with a view to reach the State, its treasury funds or property." By this ground of demurrer defendant attempted to avail himself of an act of the State of Tennessee, approved February 28, 1873, c. 13, p. 15, being § 4507 of Shannon's Code, which provides as follows: "That no court in the state of Tennessee has, nor shall hereafter have, any power, jurisdiction or authority to entertain any suit against the State, or any officer acting by the authority of the State, with a view to reach the State, its treasury, funds, or property, and all such suits now pending, or hereafter brought, shall be dismissed as to the State, or such officer, on motion, plea or demurrer of the law officer of the State, or counsel employed by the State."

The demurrer was overruled "as to that part of the bill in reference to the first tank mentioned in said bill." It was sustained "as to all that part of the bill in reference to the second tank mentioned in said bill." The ground of demurrer which went to the jurisdiction of the court was overruled "as to the oil in both tanks."

A preliminary injunction which had been granted was continued in force. Inspection, however, it was adjudged, might proceed, the fees to be paid into court pending appeal to the Supreme Court of the State.

An appeal was taken, and the Supreme Court decided that the suit was one against the State, and reversed the decree of the chancery court. 95 S. W. Rep. 824.

*Mr. H. J. Livingston, Junior*, with whom *Mr. Thomas B. Turley* was on the brief, for plaintiff in error:

The bill undoubtedly presents for determination Federal questions, as certain rights under the Constitution of the United States are asserted. It also further shows special conditions which prevent plaintiff in error from obtaining adequate protection in said constitutional rights except by injunction. This

being true, the mere refusal of the chancery court of Tennessee to take jurisdiction and grant this injunctive relief is a practical denial of the above constitutional rights, which may be reviewed by this court.

More especially is this true where the refusal of said state court to grant such relief is in obedience to or under color of an express state statute which is in itself in conflict with the Constitution of the United States. A state statute which closes the doors of the courts and prevents adequate protection against an illegal inspection of an article which is not subject to inspection under the Federal Constitution, itself amounts to an interference with interstate commerce, deprives plaintiff in error of its property without due process of law, and denies it the equal protection of the laws.

This is not a suit against the State of Tennessee. Actions against state officers to restrain them from the commission of wrongful acts to the prejudice of plaintiff's rights are not suits against the State. *Davis* v. *Gray*, 16 Wall. 203; *Pennoyer* v. *McConnaughy*, 140 U. S. 10; *Hans* v. *Louisiana*, 135 U. S. 1; *Board of Liquidation* v. *McComb*, 92 U. S. 531; *Poindexter* v. *Greenhow*, 114 U. S. 270; *United States* v. *Lee*, 106 U. S. 196; *Williams* v. *United States*, 138 U. S. 514; *Re Tyler*, 149 U. S. 164; *Cummings* v. *Merchants' National Bank*, 101 U. S. 153; *Dodge* v. *Woolsey*, 18 How. 331; *Reagan* v. *Farmers' Loan & T. Co.*, 154 U. S. 362; *Scott* v. *Donald*, 165 U. S. 107; *Belknap* v. *Schild*, 161 U. S. 107.

The oil in both of the tanks described in the bill is engaged in and a part of interstate commerce while in Tennessee.

The inspection thereof is an interference with interstate commerce, such as is contrary to the Constitution of the United States.

When goods start on their journey from State to State they become interstate commerce, and are protected from interference or regulation by any State through which they may pass until they reach their ultimate destination; notwithstanding on the way they may be delayed for a reasonable time on

account of inadequate means of transportation, or for reshipment, or assortment, or distribution, or on account of any accident, or any other cause which may intervene to prevent the goods going directly from the initial point of shipment to the point of destination. *Coe* v. *Errol,* 116 U. S. 517; *Kelley* v. *Rhoads,* 188 U. S. 1; *State* v. *Engle,* 5 Vroom (N. J.), 425; *State* v. *Carrigan,* 10 Vroom (N. J.), 35; *The Daniel Ball,* 10 Wall. 557; *Pabst Brewing Co.* v. *Crenshaw,* 198 U. S. 17; *State* v. *Engle,* 5 Vroom (N. J.), 425.

In the case at bar it is conceded that none of the oil in said two tanks will finally remain in Tennessee; the question is whether said oil while in Tennessee is in transit or at rest. With this question the original package doctrine has nothing to do; the question involved is rather analogous to those involved in the following cases hereinbefore cited: *Coe* v. *Errol,* 116 U. S. 516; *Kelley* v. *Rhoads,* 188 U. S. 1; *State* v. *Engle,* 34 N. J. L. 425; *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500.

In order to be valid, a so-called inspection law must be such in fact, and must be enacted for the purpose and must be calculated to accomplish the ends for which valid inspection laws may be enacted.

None of said oil is sold in Tennessee, and none of it is manufactured in Tennessee. Hence the inspection thereof is unnecessary to protect either the citizens of Tennessee or the reputation of her manufactured products abroad.

The fees provided by said act are unreasonable and exorbitant, and very much greater than necessary to provide for the expense of such inspection, so that the treasury of Tennessee annually receives a large surplus therefrom, which is diverted to other purposes.

The mere fact that a state statute is enacted in good faith as an exercise of the police power will not render it valid if it in fact amounts to a regulation of interstate commerce. 17 A. & E. Enc. Law, 75; *Bowman* v. *Chicago &c. Ry. Co.,* 125 U. S. 465; *State Freight Tax Case,* 15 Wall. 232; *Leisy* v. *Hardin,* 135 U. S. 100; *Louisville &c. Ry. Co.* v. *Mississippi,* 133 U. S. 587;

*Hall* v. *DeCuir*, 95 U. S. 485; *Brennan* v. *Titusville*, 153 U. S. 289; *Missouri R. R. Co.* v. *Haber*, 169 U. S. 613; *Hannibal &c. Co.* v. *Husen*, 95 U. S. 473.

*Mr. Charles T. Cates, Junior*, Attorney General of the State of Tennessee, for defendant in error, submitted:

The holding that the court below had no jurisdiction, involved no Federal question, but only the powers and jurisdiction of the courts of the State of Tennessee, in respect of which the Supreme Court of Tennessee is the final arbiter.

The construction of a state statute by the court of last resort of the State will be followed by this court, and therefore the construction by the state court of the act of 1873 and its application is conclusive upon this court. *Noble* v. *Georgia*, 168 U. S. 398; *Aberdeen Bank* v. *Chehalee County*, 166 U. S. 440; *N. Y. &c. R. R. Co.* v. *Pennsylvania*, 158 U. S. 431; *Sioux City &c. Co.* v. *Trust Co.*, 173 U. S. 99; *Clark* v. *Clark*, 178 U. S. 186; *Mo. &c. Ry. Co.* v. *McCann*, 174 U. S. 580; *Freeport Water Co.* v. *Freeport*, 180 U. S. 587, 601; *Railroad Co.* v. *Hopkins*, 94 U. S. 11; *Trip* v. *Santa Rosa &c.*, 144 U. S. 130; *Oxley Stave Co.* v. *Butler County*, 166 U. S. 648; *Loeber* v. *Schroeder*, 149 U. S. 580, 585.

The oil in question in this case was not protected from inspection by the commerce clause of the Federal Constitution.

There is no claim made in the bill that the oil is sold elsewhere than at the place of business of plaintiff in error in Memphis. It is true that plaintiff in error brings all of the oil sold by it at its place of business in Memphis from its refineries in other States, but when this oil has reached Memphis and is there stored and at rest as a part of the general mass of property in the State, it becomes subject to inspection by the Tennessee authorities. *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500.

The object of inspection laws is not only to protect the community, so far as they apply to domestic sales, from frauds and impositions, but in relation to articles designed for exportation, to preserve the character and reputation of the State in

foreign markets.  *Chutsman* v. *Northrop,* 8 Cowen, 46; *Patapsco Guano Co.* v. *Board of Agriculture,* 171 U. S. 356.

All inspection laws may have a remote and in some cases a considerable influence on commerce, as is recognized in the cases above cited, but it is not every statute passed under the police power of the State that is void because it in some way affects commerce between the States.  Many agencies employed in interstate commerce are subject to the proper police power of the State.  *Hennengton* v. *Georgia,* 163 U. S. 299; *Lake Shore Ry. Co.* v. *Ohio,* 173 U. S. 285; *N. Y. &c. R. R. Co.* v. *N. Y.,* 165 U. S. 628; *Erb* v. *Morasch,* 177 U. S. 584; *Smith* v. *Alabama,* 124 U. S. 465; *Richmond &c. R. R. Co.* v. *Patterson,* 169 U. S. 311; *Mo. &c. R. R. Co.* v. *Haber,* 169 U. S. 633; *Nashville &c. R. R. Co.* v. *Alabama,* 128 U. S. 96; *L., N. O. & T. P. R. R.* v. *Mississippi,* 133 U. S. 589; *Plessy* v. *Ferguson,* 163 U. S. 537; *Smith* v. *State,* 100 Tennessee, 494; *Pittsburg &c. Coal Co.* v. *Louisiana,* 156 U. S. 590, 600.


MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

It is contended by defendant in error that this court is without jurisdiction because no matter sought to be litigated by plaintiff in error was determined by the Supreme Court of Tennessee.  The court simply held, it is said, that, under the laws of the State, it had no jurisdiction to entertain the suit for any purpose.  And it is insisted "that this holding involved no Federal question, but only the powers and jurisdiction of the courts of the State of Tennessee, in respect to which the Supreme Court of Tennessee is the final arbiter."

Opposing these contentions, plaintiff in error urges that whether a suit is one against a State cannot depend upon the declaration of a statute, but depends upon the essential nature of the suit, and that the Supreme Court recognized that the statute "added nothing to the axiomatic principle that the State, as a sovereign, is not subject to suit save by its own

consent." And it is hence insisted that the court by dismissing the bill gave effect to the law which was attacked. It is further insisted that the bill undoubtedly presents rights under the Constitution of the United States and conditions which entitle plaintiff in error to an injunction for the protection of such rights, and that a statute of the State which operates to deny such rights, or such relief, "is itself in conflict with the Constitution of the United States."

Plaintiff in error to sustain its contention that the suit is not one against the State, but one to restrain "unconstitutional aggression" by a state officer upon private property, cites many cases in this court. To these cases defendant in error makes no other reply than to say that they were cases in the Federal courts and within the acknowledged range of the jurisdiction of courts, while the question presented by the motion to dismiss is not the rights plaintiff in error may have, but what remedies it has and the power of the State over those remedies so far as its own courts are concerned. This difference is urged as material, and the following cases are adduced: *Semple* v. *Hagar*, 4 Wall. 431; *Norton* v. *Shelby County*, 118 U. S. 425; *Smith* v. *Adsit*, 16 Wall. 185, 190; *Callen* v. *Bransford*, 139 U. S. 197; *Freeport Water Co.* v. *Freeport City*, 180 U. S. 587, 601; *Newman* v. *Gates*, 204 U. S. 89, 95; *Chambers* v. *Baltimore & Ohio R. R. Co.*, 207 U. S. 142.

A review of these cases becomes necessary. In *Semple* v. *Hagar*, Semple had a patent from the United States for a certain tract of land. He sued Hagar to quiet his title, alleging that Hagar claimed the land under a fraudulent Mexican grant, and a patent of the United States issued in affirmance of the grant. Semple prayed that the grant be declared void "as issued upon false suggestion and without authority of law." Hagar demurred to the bill, on the ground, among others, that the court had no jurisdiction of the action. The demurrer was sustained and the case was brought to this court by writ of error. A motion to dismiss was made, which was granted. The court said: "We have here a very brief record, and, on the facts of

the case, we cannot shut our eyes to the total want of juris-
diction, under the twenty-fifth section, or any other section of
the Judiciary Act.   It is plain that if the court had assumed
jurisdiction, and had declared the defendant's patent void, for
the reason alleged in the bill, the defendant would have had
a case which might have been reviewed by this court, under
the twenty-fifth section, and one on which there might have
been a question and difference of opinion.   But it is hard to
perceive how the twenty-fifth section could apply to a judgment
of a state court, which did not decide that question, and re-
fused to take jurisdiction of the case.   The matter is too plain
for argument."   In other words, it was decided that the Federal
question must be decided before it can be reviewed.   Appar-
ently there was no thought of considering whether the question
of jurisdiction was rightly decided.   That was seemingly con-
sidered out of the power of this court to inquire into.

*Norton* v. *Shelby County* was a writ to enforce the payment
of certain bonds issued by the board of commissioners of Shelby
county.   One of the questions in the case was whether the board
of commissioners was a legally constituted body.   The Supreme
Court of the State decided it was not, and this court accepted
the decision as binding.   "The determination made," we said
through Mr. Justice Field, "relates to the existence of an in-
ferior tribunal of the State, and that depending upon the con-
stitutional power of the legislature of the State to create it and
supersede a preëxisting institution.   Upon a subject of this
nature the Federal courts will recognize as authoritative the
decision of the state court."   *Claiborne County* v. *Brooks,* 111
U. S. 400, 410, was cited.

*Smith* v. *Adsit* was a suit for equitable relief against a sale
of land which a third party had undertaken to make in viola-
tion of an act of Congress.   A decree was entered against Adsit
for $6,829 and dismissed as to other defendants.   The decree
was reversed by the Supreme Court of the State and the bill
dismissed for want of jurisdiction, and the case was brought to
this court by writ of error.   A motion to dismiss was granted,

Mr. Justice Strong, speaking for the court, saying: "In view of this [the action of state court] we do not perceive that we have any authority to review the judgment of the state court." It was intimated in the opinion that a Federal question had been presented, but it was not decided. "As we have seen," Mr. Justice Strong said, "the bill was dismissed for want of jurisdiction. The judgment of the court respecting the extent of its equitable jurisdiction is, of course, not reviewable here." And, further: "It may well have been determined that the plaintiff's remedy against Adsit was at law, and not in equity, even if the sale from Holmes was utterly void, but whatever may have been the reasons for the decision, whether the court had jurisdiction of the case or not, is a question exclusively for the judgment of the state court."

In *Callen* v. *Bransford* a writ of error to the Court of Appeals of Virginia was dismissed on the ground that that court had disposed of the case on the ground that the matters involved were purely pecuniary, and that the amount in controversy in each case was less than sufficient to give the court jurisdiction under the constitution of the State. "This being so," this court said, "we are of opinion that the writs of error to that court must be dismissed."

In *Freeport Water Company* v. *Freeport City* we said: "With what functions the Circuit Courts of the State [Illinois] may be invested may not be of Federal concern. It is also a matter of construction in which we might be obliged to follow the state courts."

In *Newman* v. *Gates* the Federal right was asserted under that provision of the Constitution of the United States requiring due faith and credit to be given by each State to the public acts, records and judicial proceedings of every other State. The Supreme Court of the State (Indiana) dismissed the appeal to it as not having been properly taken. The case was brought here but dismissed. We said, through Mr. Justice White: "As the jurisdiction of this court to review judgments or decrees of state courts when a Federal question is presented is limited to

the review of a final judgment or decree, actually or construc-
tively deciding such question, when rendered by the highest
court of a State in which a decision in the suit could be had, and,
as for want of an appropriate appeal, no final judgment or de-
cree in such court has been rendered, it results that the statu-
tory prerequisite for the exercise in this case of the reviewing
power of this court is wanting."

*Chambers* v. *Baltimore & Ohio Railroad Company*, 207 U. S.
142, involved a statute of Ohio giving an action for death caused
by the wrongful act in another State only when the death was
that of a citizen of Ohio. The statute was attacked on the
ground that it violated that clause of the Constitution of the
United States which entitles the citizens of each State to all
the privileges and immunities of citizens in the several States.
The statute was sustained by this court. Mr. Justice Moody,
speaking for the court, said, p. 148:

"But, subject to the restrictions of the Federal Constitution,
the State may determine the limits of the jurisdiction of its
court, and the character of the controversies which shall be
heard in them. The state policy decides whether and to what
extent the State will entertain in its courts transitory actions,
where the causes of action have arisen in other jurisdictions.
Different States may have different policies and the same
State may have different policies at different times. But any
policy the State may chose to adopt must operate in the same
way on its own citizens and those of other States. The privi-
leges which it affords to one class it must afford to the other.
Any law by which privileges to begin actions in the courts are
given to its own citizens and withheld from the citizens of other
States is void, because in conflict with the supreme law of the
land."

But in none of these cases was the same question presented
that is presented here, nor were all of the cases cited by plain-
tiff in error to sustain the jurisdiction of this court cases in the
Federal courts. *Poindexter* v. *Greenhow*, 114 U. S. 270, and
*Chaffin* v. *Taylor*, 114 U. S. 309, were brought in the state courts

of Virginia, and they involve questions very much like those in the case at bar. *Poindexter* v. *Greenhow* was an action of detinue for personal property distrained by Greenhow for delinquent taxes, in payment of which Poindexter had tendered coupons cut from bonds issued by the State of Virginia under act of the State passed in 1871. This act, it was held, constituted a contract between the holder of the coupons and the State that they should be received for taxes, which contract, it was further held, was impaired by the subsequent act under which Greenhow justified the distraint of Poindexter's property.

It was urged that the action could not be maintained because it was substantially an action against the State to which it had not assented. It was further urged that the remedy was afforded of a right to recover back all the taxes after payment under protest, and that this constituted the sole remedy.

The first contention was discussed at length and rejected. The court said, in effect, that the defendant in the action was sued as a wrongdoer, and could only justify himself under a valid law. And it was said: "The State has passed no such law, for it cannot; and what it cannot do, it certainly, in contemplation of law, has not done. The Constitution of the United States, and its own contract, both irrepealable by any act on its part, are the law of Virginia; and that law made it the duty of the defendant to receive the coupons tendered in payment of taxes, and declared every step to enforce the tax, thereafter to be taken, to be without warrant of law. *He stands then stripped of his official character, and confessing a personal violation of the plaintiff's rights for which he must personally answer, he is without defense.*" (Italics ours.)

A distinction was made between the State and its government, and it was said that an officer representing and acting for the latter is not an agent of the former. That and other cases were reviewed in *Belknap* v. *Schild*, 161 U. S. 10, and Mr. Justice Gray, speaking for the court, said: "In a suit to which the State is neither formally nor really a party, its officers, although acting by its order and for its benefit, may be re-

strained by injunction, when the remedy at law is inadequate, from doing positive acts, for which they are personally and individually liable, taking or injuring the plaintiff's property, contrary to a plain official duty requiring no exercise of discretion, and in violation of the Constitution or laws of the United States." Cases were cited. And again: "But no injunction can be issued against officers of a State to restrain or control the use of property already in the possession of the State, or money in its treasury when the suit is commenced; or to compel the State to perform its obligations; or where the State has otherwise such an interest in the object of the suit as to be a necessary party." The case and those cited expose the error, which appears with a kind of periodicity, varied in presentation, to accommodate the particular exigency, that a State is inevitably brought into court when the execution of its laws is arrested by a suit against its officers. It seems to be an obvious consequence that as a State can only perform its functions through its officers, a restraint upon them is a restraint upon its sovereignty from which it is exempt without its consent in the state tribunals, and exempt by the Eleventh Amendment of the Constitution of the United States, in the national tribunals. The error is in the universality of the conclusion, as we have seen. Necessarily to give adequate protection to constitutional rights a distinction must be made between valid and invalid state laws, as determining the character of the suit against state officers. And the suit at bar illustrates the necessity. If a suit against state officers is precluded in the national courts by the Eleventh Amendment to the Constitution, and may be forbidden by a State to its courts, as it is contended in the case at bar that it may be, without power of review by this court, it must be evident that an easy way is open to prevent the enforcement of many provisions of the Constitution, and the Fourteenth Amendment, which is directed at state action, could be nullified as to much of its operation. And it will not do to say that the argument is drawn from extremes. Constitutional provisions are based on the

possibility of extremes.. There need not, however, be imagination of extremes, if by extremes be meant a deliberate purpose to prevent the assertion of constitutional rights. Zeal for policies, estimable, it may be, of themselves, may overlook or underestimate private rights. The swift execution of the law may seem the only good, and the rights and interests which obstruct it be regarded as in a kind of outlawry. See *Ex parte. Young, ante,* p. 123, where this subject is fully discussed and the cases reviewed.

The principles of the cases which we have cited were applied by the Supreme Court of Tennessee in *Lynn* v. *Polk,* 8 Lea, 121, where a suit against the funding board of the State was maintained against the contention that it was a suit against the State or against the officers of the State within the meaning of the act of 1873, on the ground that an officer executing an unconstitutional statute is not acting by the authority of the State. The court, however, distinguishes that case from the one at bar by saying that plaintiff in error did not assail the inspection law for being void upon its face, but only on the ground "that the oil upon which defendant was about to impose inspection fees was in law affected with interstate commerce." To enter into the inquiry involved in the contention, it was further said, "the court would be bound first to determine whether the oil in these tanks was in fact and in law, as claimed by complainant, a part of interstate commerce, and to do this we would be bound to hold, and proceed upon the theory, that the court had jurisdiction of the whole controversy." And that the court declared it was precluded from doing by the act of 1873. In other words, refused to consider that which might bring the oils under the protection of the Constitution of the United States.

A similar distinction was attempted to be made in *Poindexter* v. *Greenhow,* 114 U. S. 270, and the court replied by saying: "It is no objection to the remedy in such cases that the statute whose application in the particular case is sought to be restricted is not void on its face, but is complained of only be-

cause its operation in the particular instance works a violation
of a constitutional right; for the cases are numerous where the
tax laws of a State, which in their general and proper applica-
tion are perfectly valid, have been held to become void in
particular cases, either as unconstitutional regulations of com-
merce, or as violations of contracts prohibited by the Constitu-
tion, or because in some other way they operate to deprive the
party complaining of a right secured to him by the Constitu-
tion of the United States." And inquiries of fact may be
necessary to exhibit the unconstitutionality of a statute, as in
*Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 362, and *Smyth
v. Ames*, 169 U. S. 466.

It being then the right of a party to be protected against a
law which violates a constitutional right, whether by its terms
or the manner of its enforcement, it is manifest that a decision
which denies such protection gives effect to the law, and the
decision is reviewable by this court. *Wilmington &c.* v. *As-
brook*, 146 U. S. 279.

We are brought, then, to consider whether the law would, if
administered against the oils in controversy, violate any con-
stitutional right of plaintiff in error.

As determining an affirmative answer to this question, it is
contended that the oil in both tanks was in transit from the
place of manufacture, Pennsylvania, to the place of sale,
Arkansas. The delay at Memphis, it is urged, was merely for
the purpose of separation, distribution and reshipment, and
was no longer than required by the nature of the business and
the exigencies of transportation. The difference in the oil in
tank No. 1 and that in tank No. 2, it is further said, is that the
former was sold before shipment, and the latter was to be held
in Tennessee for sale, but in neither case was the oil to be sold
in Tennessee, and it is hence insisted that the interstate transit
of the oil was never finally ended in Memphis, but was only
temporarily interrupted there.

The beginning and the ending of the transit which consti-
tutes interstate commerce are easy to mark. The first is de-

fined in *Coe* v. *Errol,* 116 U. S. 517, to be the point of time that an article is committed to a carrier for transportation to the State of its destination, or started on its ultimate passage. The latter is defined to be in *Brown* v. *Houston,* 114 U. S. 622, the point of time at which it arrives at its destination. But intermediate between these points questions may arise. *State* v. *Engel,* 5 Vroom (N. J.), 435; *State* v. *Carrigan,* 10 Vroom (N. J.), 35; *The Daniel Ball,* 10 Wall. 557.

In *Pittsburg Coal Company* v. *Bates,* 156 U. S. 577, coal in barges shipped from Pittsburg, Pennsylvania, to Baton Rouge, Louisiana, was stopped about nine miles above destination. It was held that it had ceased to be interstate commerce, and was subject to taxation by the State of Louisiana.

In *Diamond Match Company* v. *Ontonagon,* 188 U. S. 82, logs in transit to a point without the State were held subject to taxation under a statute of the State where they would "naturally leave the State in the ordinary course of transit."

In *Kelley* v. *Rhoads,* 188 U. S. 1, a flock of sheep driven from a point in Utah across Wyoming to a point in Nebraska for the purpose of shipment by rail from the latter point was held to be property engaged in interstate commerce and exempt from taxation by Wyoming under the statute taxing all live stock brought into the State "for the purpose of being grazed." There was no difficulty in the case except that which arose from the contention that the manner of transit was adopted as an evasion of the statute. Otherwise the grazing of the sheep was as incidental as feeding them would be if transported by rail. The pertinence of the case to the present controversy is in its summary of the principles of prior cases expressed in the following passage: "The substances of these cases is that, while property is at rest for an indefinite time awaiting transportation, or awaiting a sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another State, it becomes the subject of interstate commerce and is exempt from local assessment." Property, therefore, at an intermediate point between the place of

shipment and ultimate destination may cease to be a subject
of interstate commerce. Necessarily, however, the length and
purpose of the interruption of transit must be considered.

In *State* v. *Engle, Receiver, &c.,* 5 Vroom (N. J.), 425, 435,
coal mined in Pennsylvania and sent by rail to Elizabethport,
in New Jersey, where it was deposited on the wharf for separa-
tion and assortment for the purpose of being shipped by water
to other markets for the purpose of sale, it was held that the
property was not subject to taxation in New Jersey. The court
said: "Delay within the State, which is no longer than is neces-
sary for the convenience of transhipment for its transporta-
tion to its destination, will not make it property within the
State for the purpose of taxation." See also in *State* v. *Carrigan,*
10 Vroom (N. J.), 36, where coal also shipped from Pennsyl-
vania to a port in New Jersey and remaining there no longer
than was necessary to obtain vessels to transport it to other
places was held to be in course of transportation and not sub-
ject to the taxing power of the State. In *Burlington Lumber
Co.* v. *Willetts,* 118 Illinois, 559, the principle was recognized
that property *in transitu* was not subject to the taxing power
of a State, but it was held that logs in rafts sent from Wisconsin
to Burlington, Iowa, by the Mississippi River, a part of which
were stopped at a place in Illinois called Boston Harbor, to be
there kept until needed at Burlington for mill purposes, were
subject to taxation. The court said that the property was
"kept at New Boston on account of the profit of the owners
to keep it there;" and further, that the company was engaged
in business in the State beneficial to itself, and its property
was so located as to claim the protection of the laws of the
State and hence was liable to taxation.

Like comment is applicable to plaintiff in error and its oil.
The company was doing business in the State, and its property
was receiving the protection of the State. Its oil was not in
movement through the State. It had reached the destination
of its first shipment, and it was held there, not in necessary
delay or accommodation to the means of transportation, as

in *State &c.* v. *Engle, supra,* but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the State beyond a mere halting in its transportation. It required storage there—the maintenance of the means of storage, of putting it in and taking it from storage. The bill takes pains to allege this. "Complainant shows that it is impossible, in the coal oil business, such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight charges incident to such a plan, and for the further reason that an extensive plant and apparatus is necessary, in order to properly and conveniently unload and receive the oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil."

This certainly describes a business—describes a purpose for which the oil is taken from transportation, brought to rest in the State and for which the protection of the State is necessary, a purpose outside of the mere transportation of the oil. The case, therefore, comes under the principle announced in *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500.

We have considered this case so far in view of the cases which involve the power of taxation. It may be that such power is more limited than the power to enact inspection laws. *Patapsco Guano Co.* v. *Board of Agriculture,* 171 U. S. 345, 356. The difference, if any exists, it is not necessary to observe. The cases based on the taxing power show the contentions of plaintiff in error are without merit; in other words, show that its oil was not property in interstate commerce.

As our conclusion is that no constitutional right of the oil company was violated by the enforcement of the law of 1899, it follows that no error prejudicial to the company was committed by the Supreme Court of Tennessee, and, for the reasons stated, its judgment is                    *Affirmed.*

Mr. Justice Harlan, concurring.

The fundamental question before the state court of original
jurisdiction was whether it had jurisdiction, under the consti-
tution and laws of Tennessee, of a suit like this. Manifestly, if
that court was forbidden by the laws under which it was created
to take cognizance of cases like this, it had no alternative but
to dismiss this suit. The court overruled a demurrer to the
bill, one of the grounds of demurrer being that the suit was
one "against the State or against an officer of the State, acting
by authority of the State with a view to reach the State, its
treasury, funds or property." It thereby sustained its jurisdic-
tion, and proceeded to a decree on the merits. The case being
carried to the Supreme Court of Tennessee, that court reversed
the judgment and held that no court of Tennessee could, *under
its statutes*, take cognizance of this suit and give the decree
asked. Upon that ground it did what it said the inferior state
court should have done, namely, dismissed the suit for want of
jurisdiction to give the relief asked.

The statute of Tennessee which the Supreme Court of that
State construed and held to be prohibitory of this suit was an
act passed February 28, 1873, c. 13, p. 15. It provides: "That
no court in the State of Tennessee has, nor shall hereafter have,
any power, jurisdiction or authority to entertain any suit
against the State, or any officer acting by the authority of the
State, with a view to reach the State, its treasury, funds or
property, and all such suits now pending, or hereafter brought,
shall be dismissed as to the State, or such officer, on motion,
plea or demurrer of the law officer of the State, or counsel
employed by the State."

The oil company seeks a reversal of the decree of the state
court, contending that it was denied a right arising under the
commerce clause of the Constitution. But back of any ques-
tion of that kind was the question before the Supreme Court
of Tennessee whether the inferior state court, under the law of
its organization, that is, under the law of Tennessee, could

entertain jurisdiction of the suit. The question, we have seen, was determined adversely to jurisdiction. That certainly is a state, not a Federal question.. Surely, Tennessee has the right to say of what class of suits its own courts may take cognizance, and it was peculiarly the function of the Supreme Court of Tennessee to determine such a question. When, therefore, its highest court has declared that the Tennessee statute referred to in argument did not allow the inferior state court to take cognizance of a suit like this, that decision must be accepted as the interpretation to be placed on the local statute. Otherwise, this court will adjudge that the Tennessee court *shall* take jurisdiction of a suit of which the highest court of the State adjudges that it cannot do consistently with the laws of the State which created it and which established its jurisdiction. It seems to me that this court, accepting the decision of the highest court of Tennessee, as to the meaning of the Tennessee statute in question, as I think it must, has no alternative but to affirm the judgment, on the ground simply that the ground upon which it is placed is broad enough to support the judgment without reference to any question raised or discussed by counsel.

What is said in the opinion of the court about the Eleventh Amendment, is, I submit, entirely irrelevant to any decision of the present case by this court. That Amendment relates wholly to the judicial power of the United States, and has absolutely nothing to do with the inquiry as to the jurisdiction of the inferior state court under the Tennessee statute of 1873. In determining what relief this court can or should give, in respect of the judgment under review, we need not consider the scope and meaning of the Eleventh Amendment; for, it was long ago settled that a writ of error to review the final judgment of a state court, even when a State is a formal party and is successful in the inferior court, is not a suit within the meaning of the Amendment. *Cohens* v. *Virginia,* 6 Wheat. 264, 408, 409.

In my opinion, the decision of the Supreme Court of Tennessee, that the inferior state court was forbidden by the law of

its being from taking cognizance of this suit, is conclusive here, and the judgment of that court should, therefore, be affirmed without reference to any other question raised or discussed.

Mr. Justice Moody, dissenting.

I am unable to agree to the judgment in this case, for the reason that the statute here in question, as it was enforced against the property of the plaintiff in error, in my opinion was an interference with interstate commerce, which was beyond the power of the State. It is to be observed that the court below did not construe the statute as applying to articles in the course of transportation between the States and not destined for sale to consumers in the State, or, in other words, the court did not hold that the statute applied to the property here affected by it. On the contrary, the court expressly refrained from passing upon the merits of the controversy, and dismissed the bill for want of jurisdiction. We, however, have assumed jurisdiction of the controversy, for reasons given in the opinion of the court, in which I concur, and therefore cannot escape the duty of interpreting the meaning of the statute. I think we should, if it be possible, give to the statute a meaning which places its constitutionality beyond doubt. The law seems clearly to be designed to protect state manufacturers and consumers within the State. Its operation is limited by the words of the first section, which directs the Governor to appoint inspectors for illuminating fluids "which may be manufactured or offered for sale in the State." Far from enlarging the meaning of these restrictive words, the other provisions of the law accord with and confirm them. The oil in tank No. 1 at least, which was neither manufactured in the State nor offered for sale in the State, is by this interpretation removed from the operation of the statute, and I think we ought so to decide.

But, if it be assumed that the oil in tank No. 1 is subjected to inspection by the law, in my opinion the law is unconstitu-

tional. The law is not sustained by the judgment of the court as an inspection law, which it purports to be. Perhaps it could not be under the doctrine announced and applied in *Minnesota* v. *Barber*, 136 U. S. 313, and *Brimmer* v. *Rebman*, 138 U. S. 78. I am therefore relieved from considering whether the law, because it is a mere cloak for exacting revenue from interstate commerce, is bad as an inspection law. The judgment of the court treats it as such, and it is sustained not as an inspection but as a revenue law. I do not dissent from such an interpretation of its effect. But, with unfeigned deference to the opinions of my brethren, I venture to think that the statute, as enforced in the case at bar, is bad as a taxing law. The case of *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500, holds that articles before they have ceased to be the subjects of interstate commerce may still be reached by the taxing power of the State. Accordingly it was held that the property of a citizen of another State which had been brought into the State of Tennessee, placed in a warehouse for sale, and from there sold to persons within as well as without the State, was subject to a state tax. It was observed in the opinion in that case that the property had come to rest in the State and was enjoying the protection of its laws. But the case at bar, so far as it concerns the oil in tank No. 1, to which I confine my observations, is sharply distinguished from that case. The judgment here takes a step forward which I think ought not to be taken. The oil in that tank had been sold while in Pennsylvania and Ohio to purchasers in other States than Tennessee, before it started in the course of interstate transportation. It was shipped especially in pursuance of such sales. It was in Tennessee only momentarily ("a few days"), for the purpose of repacking and reshipping it, and for no other purpose whatever. The delay was to meet the exigencies of interstate commerce, which arose out of the nature of the transaction. It does not seem to me important, if such be the case, that it would begin the remainder of its interstate journey under a new contract of shipment. It would no more seem to be the subject of state taxation than

a drove of cattle, whose long interstate journey was interrupted, for humane reason, to give them a few days of rest and refreshment. With respect to this oil, no business whatever was done in the State except that which was required to conduct the transaction of interstate commerce begun in another State and to be completed in a third State. The single consideration that the property enjoys in Tennessee the protection of the laws of the State cannot be enough to justify state taxation. If that were so, all property in the course of interstate transportation would be subject to state tax in every State through which it should pass. I conclude that the oil in question was actually in the course of transportation between the States, was delayed in the State of Tennessee only for the purpose of conveniently continuing that transportation, and was, therefore, protected from state taxation by the commerce clause of the Constitution. *Coe* v. *Errol*, 116 U. S. 517, 525; *Kelley* v. *Rhoads*, 188 U. S. 1. Cases of taxation upon property before it has entered the channels of interstate transportation, or after the transportation has finally ended, seem to me to have no application. In the former class the property is taxable because it has not ceased to be a part of the mass of the property of the State, and in the latter class because it has come to rest as a part of the mass of the property of the State. Between those two points of time it is exempt from the taxing power of the State. In every case where the tax has been sustained there were facts present regarded as essential by the court, which are absent here. The property had either not began its interstate journey, as in *Coe* v. *Erroll, ub. sup.*, and *Diamond Match Company* v. *Ontonagon*, 188 U. S. 82, or it had ended that journey and was held for sale in common with other property in the State, as in *Brown* v. *Houston*, 114 U. S. 622; *Pittsburg Coal Company* v. *Bates*, 156 U. S. 577, and *American Steel & Wire Company* v. *Speed, ub. sup.*

Mr. Justice Holmes concurs.